### THE GOVERNOR NEWELL.

*(District Court, D. Oregon. July 7, 1887.)*

**LIBEL FOR MASTER'S WAGES—COUNTER-CLAIM FOR DAMAGES.**
 The balance of wages decreed on the admission in the pleadings, and the counter-claim for damages resulting from an injury to the boat while in libelant's charge, by a collision with the steamer Oregon, found not proven.

*(Syllabus by the Court.)*

In Admiralty.
*Edward N. Deady*, for libelant.
*Seneca Smith*, for claimant.

DEADY, J. The libelant, a duly-licensed pilot, brings this suit against the Governor Newell, a stern-wheel steam-boat plying on the lower

Columbia river, to recover wages for his services as pilot and master thereon, from October 6, 1886, to and including January 30, 1887, at the rate of $100 per month; claiming that there is due him on that account the sum of $260. The answer of the claimant, John C. Trullinger, admits the employment and service, and that the libelant's wages in all amount to $383.33, of which it is alleged $170 has been paid him. He then sets up a counter-claim for $254.95 damages, sustained by an injury to the boat, caused, as it is alleged, by the misconduct of the libelant. From the evidence it appears that on Sunday, January 30, 1887, the Governor Newell was engaged in towing a ship from Brookfield to Astoria, under the charge of the libelant as pilot and master, the claimant being on board; that the weather became very rough, with a strong head wind so that the boat and ship, which were along-side, bumped together until it was thought advisable to drop the latter at Pillar rock, a point about 16 miles above Astoria, where she cast anchor, while the former proceeded to the dock at the upper end of Hume's cannery, and tied up there. At this time the claimant and libelant expected the boat to return to the ship in the morning, and tow her down to Astoria, on the early ebb-tide, which commenced to run at Astoria soon after high water, or 5:04 A. M., to do which it would be desirable to start up an hour or two sooner on the last of the flood. On leaving the boat at the dock, the claimant directed the libelant to go down to Kinney's dock, at the lower end of Astoria, "when the wind dies down a little," and take on some wood, so as to be ready to go up the river after the ship in the morning. The claimant's son was usually serving on the boat as mate, and on this day was also acting as fireman; but, when the boat made the dock, he went home, and on account of some injury to his house caused by the storm, he did not return that day. All this occurred in the forenoon, and about 2 o'clock in the afternoon the libelant took the boat down to Kinney's dock, and took on wood; the crew consisting of himself, the engineer, and two deck-hands, one of whom acted as fireman. On the way back to her berth the rudders of the Newell fouled, and she got into the trough of the sea, and drifted up stream with the wind and tide about 100 feet outside of the wharves. The libelant directed one of the men below to clear the rudders, but he did not succeed; and in the mean time the former kept backing and going ahead, as occasion required, to keep the boat in the proper course, —from drifting into the wharves, or going too far out into the stream. It was not safe, if possible, to make the Newell's berth until her rudders were cleared, and so she was allowed to drift past Hume's cannery until she came opposite the screw steam-ship Oregon, lying along-side of her dock, bow up stream, when she backed in so far as to collide with the stern of the steam-ship on her starboard quarter, just abaft the engine, and stove in her hull above the water-line, cut into the roof, bent the eccentric rods, and carried away the cross-piece that connects the timbers on which the wheel rests. As soon as the boat struck the Oregon, her bow swung round with the current until she lay along-side of the steamer, where she was made fast until her rudders were freed,

when she was taken to her dock, which was sheltered by reason of being inshore from the wharves immediately below it.

The libelant testified that, finding there was no danger of her sinking, he went ashore, leaving the engineer on board; that he went back at 10 P. M., and again at 5 in the morning, expecting to go up the river, and tow the ship down, when he met the engineer on board, who said the claimant had been there, and said the Newell should not go out until she was repaired, and also accused the libelant of purposely attempting to sink her, in the interest or at the instance of the Oregon Railway & Navigation Company,—a strong corporation, also engaged in towing on the river; whereupon the libelant left the boat, and went ashore, where he afterwards met the claimant, who repeated the accusation substantially, and soon after, when the libelant demanded the wages due him, said he owed him nothing.

In this counter-claim for damages it appears that an injury to the stem of the boat is included; but this could not have been the result of the collision with the Oregon, and was probably caused by the chafing and bumping between the boat and the ship while the latter was being towed down the river in the morning. A ship carpenter testifies that he examined the boat soon after the accident, and estimated the cost of putting her in good condition at $150, without considering the stem, to which his attention was not called; but it does not appear explicitly whether this estimate was based on repairing the injuries caused by the collision only, or putting the boat in good repair generally. The fact appears to be that the boat was repaired, at a cost not to exceed $50 or $60, sufficiently for ordinary use. The burden of proof is on the claimant to establish this counter-claim.

The only question in the case is whether the libelant was guilty of misconduct in taking the boat down to Kinney's dock for wood when and as he did, or in the management of her while so engaged. And, first, it is contended that the libelant did wrong in taking the boat from the dock in the state of the weather, because he was directed not to do so by the claimant. But the fact is, according to the express admission of the claimant on cross-examination, he did not forbid the libelant absolutely from taking the boat out, but rather the contrary; for he said: "Go down and get wood as soon as the wind dies down a little." Take this remark in connection with the circumstances well known to both libelant and claimant, that the boat needed wood, and that it was desirable to start up the river the next morning near 4 o'clock, on the last of the flood-tide, so as to bring the ship down on the ebb, and there is implied an expectation and understanding that the wood would be obtained that day; but, as there was plenty of time, the libelant had better wait until the wind abated "a little," which he did, according to his judgment.

Neither was there any impropriety in the libelant's going for the wood when and as he did. The engineer said he was ready. There were two hands on board, with nothing to do but to assist the engineer, and help make the landing. The boat went down to the dock, and got the wood, without any difficulty. E. P. Parker, a licensed pilot and engineer, was

on the dock, and, being desirous of meeting the steam-boat Telephone, which was then approaching the landing from Portland, preferred to ride up in the pilot-house of the Newell to walking up the street,—all of which argues that there was no unusual danger at the time from the elements in removing the boat, nor, as a matter of fact, did any injury result to the boat from either the wind or waves. The rudders becoming foul—for which no one blames the libelant—as the Newell left the Kinney dock, she was unmanageable, and the only thing to do, so far as appears, was to let her drift broadside up the stream with the wind and tide, keeping her as near the shore or line of the wharves as was prudent, by backing and going ahead, as occasion required, until the rudders were cleared, or an anchor cast, or something found to make fast to.

In my judgment, the misconduct occurred when the Newell came abreast of the stern of the Oregon. This the libelant acknowledges, and says it was the fault of the engineer in not going ahead on his engine when ordered to, but continued backing until the collision occurred. Parker corroborates this statement strongly, and there is nothing in the evidence to the contrary. The engineer, who remained in the employ of the claimant, is not produced as a witness, nor his absence accounted for. The only inference is that his testimony would not be serviceable to the claimant on this point.

In support of the theory that the injury to the boat was in some way the result of the libelant's misconduct or incompetence, either in taking the boat out as he did, or managing her afterwards, testimony was introduced tending to show that he was drunk on this occasion, and the claimant even testified that he and his son were both in the habit of getting drunk, so that they were unfit to make contracts for the boat; but he trusted them with her on the theory that they would not both get drunk at the same time. But the evidence against the libelant on this point, at least on this occasion, is very weak, and is more than overcome by the evidence to the contrary; and, even if he was drunk, he is not responsible for the engineer's failure to obey the signal to go ahead.

This case, after being cleared of the cloud of immaterial circumstances with which the claimant has sought to envelop it, turns on the single question, "Who is to blame for backing the Newell into the Oregon?" If the libelant did not give a timely order to go ahead, he is to blame, whether drunk or sober; but if he did give such order, and the engineer failed to obey it, then the latter is to blame. The libelant and Parker both swear positively that the signal was given to go ahead, and that the engineer failed to obey it. The claimant has introduced no evidence on the point, and, what is more, has failed to produce the engineer, or account for his absence. On this evidence there can be but one answer to the question. The libelant is not to blame.

This disposes of the counter-claim. It is not likely that it would ever have been made but for the claimant's rash and apparently unfounded suspicion that an attempt had been purposely made to sink his little boat in the interest of his powerful rival, so as to get her out of the towing business.

The testimony of the libelant shows that he was paid $140,—$20

twice in November, and $100 in January,—from which it follows that there is due him only $243.33, instead of $260, as alleged in the libel. The claimant swears that he paid him $30 additional at his house, which the libelant flatly denies. The libelant had a current memorandum of moneys received, which he produced and submitted to counsel. The claimant, although a man of business habits, and engaged in business affairs, and although it appears from the evidence that he keeps an office where the affairs of this boat are reported and kept an account of, did not produce any memorandum or entry in support of his statement. Under these circumstances, the burden of proof being on him to establish the payment, I must conclude that he is mistaken as to the payment of the $30.

In conclusion, I find that the libelant was not guilty of misconduct as pilot and master of the Governor Newell, and that the claimant is not entitled to recover of him any damage for the injury occurring to said boat on January 30, 1887; and that at and before the commencement of this suit the claimant was indebted to the libelant in a balance of $243.33 for services as pilot and master of said boat, which, by the law of this state, (Sess. Laws 1876, p. 9,) is a lien thereon; for which sum, together with six months' interest thereon, ($8.73,) in all $252.06, the libelant is entitled to a decree; and it is so ordered.